UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS MAGEE, JR., | Case No.   1:21-cv-01598-KES-HBK (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY [2] |
| v. | |
| CHANCE ANDES, ACTING WARDEN,[1] | FOURTEEN-DAY OBJECTION PERIOD |
| Respondent. | |

## I.    STATUS

Petitioner Louis Magee, Jr. ("Petitioner" or "Magee"), a state prisoner, is proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on August 20, 2021. (Doc. No. 1, "Petition").  Petitioner challenges his convictions after a jury trial for attempted premeditated murder; stalking; making criminal threats; violating a restraining order; assault on a peace officer; evading a peace officer; and hit and run.  (Case No. BF168256A).  (Doc. 24-14 at 2; Doc. No. 24-2 at 162-70).[3]  The Kern County Superior Court sentenced Petitioner to an

---

[1] Respondent asks that Chance Andes, Acting Warden for San Quentin State Prison, be substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

[2] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

[3] All citations to the pleadings and record are to the page number as it appears on the Case Management

1  indeterminate term of life in prison with the possibility of parole and a consecutive total

2  determinate term of seven years and four months.  (Doc. 24-14 at 2; Doc. 24-9).

3       On appeal, the Fifth Appellate District Court reduced Petitioner's felony convictions for

4  violating a restraining order to misdemeanor convictions and remanded the matter for

5  resentencing.  (Case No. F077067).  (Doc. No. 24-14 at 32).  The appellate court otherwise

6  affirmed the judgment.  (*Id.*).  On November 10, 2020, the California Supreme Court summarily

7  denied Magee's petition for review.  (Case No. S264778).  (Doc. No. 24-16).

8       On January 11, 2021, Magee filed a petition for writ of habeas corpus in the California

9  Supreme Court.  (Case No. S266584).  (Doc. No. 24-17).  Magee raised claims asserting the

10  prosecution withheld evidence, used perjured testimony, made misleading statements in closing

11  arguments, and tampered with evidence. (*Id.* at 5-16).  The California Supreme Court summarily

12  denied the petition on June 30, 2021.  (Doc. No. 24-18).

13       The instant federal Petition presents the following (restated) grounds for relief:

14
15       (1) There was insufficient evidence to support Petitioner's attempted murder conviction.

16
17       (2) Even if there was sufficient evidence to support his attempted murder conviction, there was insufficient evidence to support the finding of premeditation and deliberation.

18       (3) The prosecution knowingly relied on false testimony at the preliminary hearing.

19
20       (4) The prosecution withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

21       (5) The prosecution submitted false statements at trial.

22       (6) The prosecution misled the judge in her closing argument at trial.

23
24       (7) The prosecution misled the judge in her closing argument at the preliminary hearing.

25  (*See* Doc. No. 1 at 5-8, 17-35; Doc. No. 1-1 at 48, 54, 62, 64; Doc. No. 1-2 at 3).  Respondent

26  filed an Answer (Doc. No. 23), arguing Petitioner was not entitled to relief on any of his grounds,

27

28  and Electronic Case Filing ("CM/ECF") system.

1   and lodged the state court record in support (Doc. Nos. 24, 24-1 through 24-18).  Petitioner filed a

2   reply on April 6, 2022.  (Doc. No. 25).

3        Over a year later, Petitioner moved for a stay and abeyance to exhaust state court

4   remedies.  (Doc. No. 28).  However, because Petitioner failed to identify any specific

5   unexhausted claim that he intended to exhaust, the undersigned entered Findings and

6   Recommendations to deny the motion to stay, which the district court adopted in full on July 3,

7   2024.  (Doc. Nos. 30, 42).  While the Findings and Recommendations were pending, Petitioner

8   filed multiple motions seeking to either supplement or amend the Petition.  (Doc. Nos. 32, 33, 36,

9   37).  The undersigned denied the motions without prejudice and advised Petitioner that "[t]o the

10  extent that [he] seeks to amend the Petition to include a new claim(s) that are now exhausted, he

11  must file a motion to amend accompanied by a freestanding proposed 'First Amended Petition.'"

12  (Doc. No. 39).

13       On February 1, 2024, Petitioner filed a First Amended Petition.  (Doc. No. 40).  The

14  undersigned construed the First Amended Petition as a motion for leave to file an amended

15  petition.  (Doc. No. 45).  Respondent filed an opposition, arguing the motion for leave should be

16  denied because Petitioner failed to explain his delay in bringing the motion, failed to identify the

17  new claims he sought to add, failed to explain "why amendment would not be futile given his

18  proposed amended petition seems to raise generally the same claims raised in the original

19  petition;" and failed to show any new claims would not be untimely.  (Doc. No. 46 at 1-2).

20  Petitioner filed a reply, which argued in support of his underlying claims but failed to address any

21  of Respondent's arguments against allowing amendment.  (Doc. No. 47).

22       This matter is deemed submitted on the record before the Court.  After careful review of

23  the record and applicable law, the undersigned recommends denying leave to amend and

24  recommends the district court deny Petitioner relief on his Petition and decline to issue a

25  certificate of appealability.

26  **II.    LEAVE TO AMEND**

27       A habeas corpus petition "may be amended or supplemented as provided in the rules of

28  procedure applicable to civil actions."  28 U.S.C. § 2242; *see also* Rules Governing Section 2254

1    Cases in the United States District Court, Rule 12; Fed. R. Civ. P. 81(a)(4).  As the undersigned

2    previously explained, Petitioner is required under Federal Rule of Civil Procedure 15(a) to obtain

3    leave from the Court or consent from the Respondent to file an amended petition.  (*See* Doc. No.

4    39 at 2-3; Doc. No. 45 at 2).  "The court should freely give leave to amend when justice so

5    requires. Futility of amendment can, by itself, justify the denial of a motion for leave to amend.

6    Amendment is futile if the claim sought to be added is not viable on the merits."  *Hooper v.*

7    *Shinn*, 985 F.3d 594, 622 (9th Cir. 2021).

8          Here, the proposed amended petition seeks relief based on the following grounds: (1)

9    insufficient evidence to support Petitioner's attempted murder conviction; (2) insufficient

10   evidence of intent or commission of a direct but ineffectual act toward accomplishing the

11   intended killing; (3) withholding of evidence in violation of *Brady*; (4) improper statements by

12   the prosecution in closing argument; and (5) admission of false evidence by the prosecution.

13   (Doc. No. 44 at 11-73).  While at times Petitioner seeks to add additional information in support

14   of the proposed amended petition, each of the grounds for relief are already contained in the

15   Petition.  (*See* Doc. 1 at 5-8, 17-35; Doc. No. 1-1 at 48, 54, 62, 64; Doc. No. 1-2 at 3).  As

16   discussed below, Petitioner has failed to show that he is entitled to relief on any of these grounds

17   such that amendment would be futile.   Accordingly, undersigned recommends that the construed

18   motion for leave be denied.  The undersigned turns to the merits of the Petition.

19   **III.    HABEAS GOVERNING LEGAL PRINCIPLES**

20        **A.    Evidentiary Hearing**

21          In deciding whether to grant an evidentiary hearing, a federal court must consider whether

22   such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

23   would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474

24   (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

25   precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id*.  Here,

26   the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the

27   pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

28   hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

4

**B.      ADEPA General Principles**

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572 U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

1   [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

2   extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

3   407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

4   relief so long as fair-minded jurists could disagree on the correctness of the state court's

5   decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the

6   state court decision "was so lacking in justification that there was an error well understood and

7   comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

8       When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

9   State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

10  the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

11  *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

12  merely because the federal habeas court would have reached a different conclusion in the first

13  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

14      Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

15  constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

16  *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

17  AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

18  prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

19  petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

20  precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

21  112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

22  to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

23  cleared both tests." *Id*. at 134.

24      As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

25  an "adjudication on the merits" in state court. An adjudication on the merits does not require that

26  there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

27  at 98. "When a federal claim has been presented to a state court and the state court has denied

28  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

1  of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption

2  may be overcome when there is reason to think some other explanation for the state court's

3  decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to

4  discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

5  289, 293, 298-301 (2013).

6      While such a decision is an "adjudication on the merits," the federal habeas court must

7  still determine the state court's reasons for its decision in order to apply the deferential standard.

8  When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to
> the last related state-court decision that does provide a relevant
> rationale. It should then presume that the unexplained decision
> adopted the same reasoning. But the State may rebut the
> presumption by showing that the unexplained affirmance relied or
> most likely did rely on different grounds than the lower state court's
> decision, such as alternative grounds for affirmance that were
> briefed or argued to the state supreme court or obvious in the record
> it reviewed.

14  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state

15  court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

16  decision, as AEDPA directs us to do." *Id*. at 1196.

17  **IV.    RELEVANT FACTUAL BACKGROUND**

18      The Court adopts the pertinent facts of the underlying offenses, as summarized by the

19  California Fifth District Court of Appeal. A presumption of correctness applies to these facts.

20  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

21                          **FACTUAL SUMMARY**

22      **I.    Prosecution Case**

23      **A.    Background**

> Defendant and his former fiancée, L.S., were together for three
> years before breaking up in September 2016. At that time, they
> lived in L.S.'s apartment in Bakersfield and she permitted him to
> continue living there for a while because he had nowhere to go. L.S.
> testified that they did not get back together, but after she moved in
> with her cousin next door, she brought him food because he was not
> working and he did not have the key to the apartment so she would
> have to let him in sometimes.

7

At the beginning of January 2017, L.S. obtained a restraining order against defendant. On January 7, 2017, defendant called her more than five times from his own phone and from blocked phone numbers, even though she had changed her phone number. L.S. testified that defendant threatened to kill her and then himself, and she feared for her safety. He also left a voicemail message stating, "Answer your phone, bitch." L.S. called 911 and reported that defendant kept calling her, including at her job, despite the restraining order.

On January 25, 2017, defendant called L.S. more than 10 times from different phone numbers and left messages. She testified he also came over to the apartment and threw rocks at the window to get her to come out. L.S. called 911 in fear and reported that defendant kept calling her, in violation of the restraining order. Officer Vining, who responded to the call, testified that he saw approximately 28 missed calls on L.S.'s call log from unknown numbers and also saw text messages from unknown numbers. L.S. told Vining that she sometimes received calls at work from unknown numbers and that she had changed her phone number in the past because defendant was contacting her.

When her lease expired in January 2017, L.S. moved in with her cousin, A.W., who lived in the apartment next door.

**B.      Charged Events**

**1.      Incident on May 1, 2017**

On May 1, 2017, L.S. was hanging out at the apartment with A.W. and another cousin, A.G. Earlier in the day, defendant texted L.S. and made comments regarding where she was and what she was wearing, which caused her to believe he was following her. L.S. later received a call from defendant telling her he was outside and he wanted her to come out. She testified that he threw a rock at the bedroom window and she saw him outside driving with his lights off, running up and down the stairs, and hiding around bushes. L.S. testified that she feared for her life because prior to showing up, defendant threatened over the phone to harm her and himself. A.G. heard defendant threaten to kill L.S. when the phone was on speaker, and when defendant showed up, A.G. called 911 before turning the call over to L.S. It was dark outside, and L.S. reported defendant had his lights off and she did not know where he was.

The entrance gate into the apartment complex was not working at the time and, when the police arrived, L.S. left the apartment to trigger the exit gate with her car so that police could enter the complex. After L.S. got into her car, defendant pulled up behind her in his car, blocking her in. He bumped the rear of her car with the front of his car and then drove toward the exit gate.

Officers Glenn and Salazar arrived at the apartment complex in response to the 911 call shortly after 11:30 p.m. Someone drove out of the complex, which allowed Glenn to drive the patrol car in through the exit gate. Several other responding patrol cars remained

outside of the gate. Glenn and Salazar heard screaming and cries for help from a group of women. Someone yelled, "'That's him,'" and pointed toward defendant's car, which was then behind L.S.'s car blocking it in. Glenn parked the patrol car and Salazar was in the processing [sic] of exiting from the passenger side when defendant turned his car toward them and accelerated at a high rate of speed. Glenn testified that Salazar "dove" back into the patrol car and if she had not done so, defendant would have hit her with his vehicle. Glenn thought defendant was going to hit their patrol car head on and braced for impact. Defendant drove to the exit gate, however, and while he waited for it to open, Glenn turned the patrol car around and pulled behind defendant.

Glenn and Salazar followed defendant out of the apartment complex. During the ensuing pursuit, defendant ran multiple red lights at high speed and once he was on the highway, he accelerated up to 115 miles per hour. At one point, he lost control of his car and hit a cement guardrail. After they broke off the pursuit for safety reasons, Glenn and Salazar returned to the apartment complex and spoke with L.S., A.G., and A.W. While the officers were there, defendant called L.S.'s phone and she answered. Defendant then spoke to Glenn and identified himself as the individual involved in the pursuit. Defendant agreed to meet Glenn at the Kmart parking lot but when Glenn responded to that location, defendant failed to show up.

**2.      Incident on May 9, 2017**

L.S. moved out of her cousin's apartment shortly thereafter. Subsequently, on May 9, 2017, A.W. was asleep in the bedroom she and L.S. had shared before L.S. moved out. A.W. heard defendant jiggle the door and call for L.S. Defendant threw rocks at the bedroom window and A.W. heard him at the window. After A.W. heard a loud bang against the window, she feared he was going to break in and called 911. A.W. testified that she told defendant L.S. was not there and he would become silent for a while before returning. A.W. stated that defendant had behaved similarly on other occasions and she would wait for him to leave, but this time "felt different" and she feared for her life.

Multiple officers, including Glenn and Salazar, were dispatched to A.W.'s apartment at approximately 2:45 a.m. They searched the apartment complex and Glenn located defendant hiding in the backseat of his car, which was backed into a parking stall. From that position, defendant had a direct view of A.W.'s apartment, including the door, windows, and stairwell to the apartment, which was on the second story. Salazar located a bag in the front seat of the car that contained a large, fixed-blade butcher knife, duct tape, yellow rubber dishwashing gloves and multiple large trash bags. The items appeared to be new. Salazar also observed what appeared to be fresh smudge marks consistent with fingerprints on the bedroom window.

Officer Glenn testified that defendant admitted he knew there was a restraining order against him, admitted he had threatened to kill

1    L.S. on May 1, 2017, and stated that he and L.S. had a "negatively
     reinforced relationship." Defendant expressed he was upset because
2    he believed that L.S. had been unfaithful to him and that he had
     sacrificed a lot for her. Glenn also testified that defendant first said
3    he had the items in his car because his aunt was getting rid of
     things, but he later admitted that he brought them to L.S.'s
4    apartment "in order to have a discussion with [her]."

5    **II.      Defense Case**

6    Officer Yeary responded to L.S.'s 911 call on January 7, 2017.
     Yeary testified that L.S. did not report that defendant was
7    physically present, that defendant threatened to kill her or himself,
     or that she had voicemails or texts from him threatening to kill her;
8    and Yeary did not take a photo of any text messages. Yeary did not
     recall if L.S. described an incident where defendant grabbed her
9    arm, but Yeary did not document such an incident in her report. On
     cross-examination, Yeary confirmed that there was a valid
10   restraining order in place on January 7, 2017, L.S.'s cell phone
     showed 10 missed calls from blocked numbers, L.S. told her
11   defendant often called from blocked numbers, and L.S. played a
     voicemail from defendant in which he stated, "'Answer your phone,
12   bitch.'"

13   Officer Salazar testified that she did not recall L.S. telling her that
     defendant walked up the stairs to the apartment on May 1, 2017,
14   that he hid by the bushes and the pool area, or that he threw rocks at
     the window; and that information was not documented in Officer
15   Glenn's report. On cross-examination, Salazar testified that both
     L.S. and A.G. appeared stressed out on May 1, 2017.

16
     Finally, defendant's cousin, L.R., testified that defendant lived with
17   her in Los Angeles between January or February 2017 and April
     2017. During that time, L.R. saw and heard defendant and L.S.
18   conversing by video call and on speaker phone. L.R. heard L.S.
     initiate a phone call to defendant in April 2017, and L.S. and
19   defendant would talk like "boyfriend and girlfriend" during calls.

20   L.R. testified that in April 2017, her mother wanted some
     household items removed from the house they shared, and they
21   asked defendant to help and to straighten up outside in the yard.
     They gave him trash bags and tape to pack things and yellow rubber
22   gloves because the task was dirty. On cross-examination, L.R. said
     they used a knife and scissors; the filled, taped bags of items were
23   taken to Goodwill in Los Angeles; and defendant used the rubber
     dish gloves because it was dirty and dusty outside.

24
     **III.     Rebuttal**
25
     On rebuttal, Officer Salazar testified that the yellow rubber gloves
26   she seized from defendant's car appeared to be brand new and did
     not have any dirt or dust on them. The trash bags also appeared to
27   be brand new.

28   (Doc. No. 24-14 at 3-7).

                                    10

## V.    ANALYSIS

Each of Petitioner's grounds were raised either on direct appeal to the Fifth Appellate District Court and denied on the merits, then subsequently raised and summarily denied by the California Supreme Court, or raised on collateral review and summarily denied by the California Supreme Court.  Thus, each ground is exhausted.  For grounds raised on direct appeal, the Court looks through to the Fifth Appellate District's reasoned decision in evaluating the claims under the deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.  For claims denied without explanation, Petitioner must still show "there was no reasonable basis for the state court to deny relief."  *Harrington*, 562 U.S. at 98.

### A.    Grounds One and Two-Sufficiency of the Evidence

In his first two grounds, Petitioner challenges the sufficiency of the evidence to support his attempted murder conviction and the jury's determination that he acted with premeditation and deliberation.  (Doc. No. 1 at 5, 17-35).

#### 1.  State Court Decision

The Fifth Appellate District denied Plaintiff's sufficiency claims, ruling as follows:

#### A.  Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense[]" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio*, *supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....'" (*People v. Nguyen*, *supra*,

11

61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.)

…

## B. Elements of Attempted Premeditated Murder

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) While murder is an unlawful killing with express *or* implied malice aforethought (§§ 187, subd. (a), 188; accord, *People v. Rangel* (2016) 62 Cal.4th 1192, 1220), attempted murder requires specific intent to kill, or express malice, "'and the commission of a direct but ineffectual act toward accomplishing the intended killing'" (*People v. Smith* (2005) 37 Cal.4th 733, 739; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654). Express malice is shown when the defendant "'either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.'" (*People v. Houston*, *supra*, 54 Cal.4th at p. 1217; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8 (*Decker*); accord, *People v. Garton* (2018) 4 Cal.5th 485, 514 (*Garton*).) "[E]vidence of motive is often probative of intent to kill[,]" but it "is not required to establish intent to kill[.]" (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.) Intent "may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Ibid.*)

Unlike murder, "attempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 654.) More than a specific intent to kill is required to support a finding of deliberation and premeditation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*Ibid.*) "'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.…" [Citations.]'" (*Ibid.*)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [(*Anderson*)], [the Supreme] [C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence

12

recurring in those cases: planning, motive, and manner of killing." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.'" (*People v. Koontz, supra*, 27 Cal.4th at p. 1081; accord, *People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground by *People v. Dalton, supra*, 7 Cal.5th at p. 214.) The "guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight." (*People v. Halvorsen, supra*, at p. 420; accord, *People v. Casares, supra*, at p. 824.).)

## IV.    Analysis

### A.    Attempted Murder Conviction

#### a.    Intent to Kill

Defendant argues that there is insufficient evidence supporting the jury's finding that he acted with intent to kill L.S., and he characterizes the evidence that he made "a credible threat" against her on May 1, 2017, as "dubious." Relying on *People v. Miller* (1935) 2 Cal.2d 527 (*Miller*), discussed below, defendant contends that regardless, making a threat is not necessarily sufficient to prove intent to kill and "the law cannot assume that [his] presence at the apartment complex would 'ripen into a criminal act.'" In reference to evidence that he showed up other times trying to get L.S.'s attention and that he would sometimes sleep on the apartment complex grounds, he also contends there is no indication his presence at the complex on May 9, 2017, was restricted to that night or related to an intent to kill.

We find defendant's arguments unpersuasive. Issues of witness credibility are reserved for the trier of fact, and although the jury might have concluded that L.S., A.G., and A.W. lacked credibility and rejected their version of events, it was not compelled by the evidence to do so. As discussed, our task on review is confined to determining whether, viewed in the light most favorable to the prosecution, the jury's verdict is supported by substantial evidence.

#### 1)    Evidence Sufficient

In this case, there is evidence that between the time L.S. obtained a restraining order against defendant in early January 2017 and May 1, 2017, he threatened to kill her and himself, he threatened to harm anyone who stood in his way, he threatened to show up at L.S.'s place of employment, and he repeatedly harassed her. L.S. testified that on May 1, 2017, defendant threatened to harm her prior to showing up at the apartment complex and she feared for her life, A.G. testified that she heard defendant threaten to kill L.S. that day, and Officer Glenn also testified that defendant admitted threatening to kill L.S. on May 1, 2017. That specific threat to kill, which also underpinned the stalking and criminal threats counts, was highlighted by the prosecutor during closing when she argued that defendant showed up on May 9, 2017, with the intent to kill L.S.

13

L.S. denied inviting any contact by defendant or engaging with him, and she testified unequivocally that she feared for her safety and believed defendant was capable of killing her. She changed her phone number repeatedly in an effort to keep defendant from contacting her, but he would find out her new number; and during the time period in question, he flooded L.S. with repeated calls and texts from different blocked numbers, including calling her place of employment. L.S. testified that she was afraid to be alone and she stayed with different family members to avoid being found by defendant, and that after her apartment lease expired, she moved in with her cousin so she would not be alone. L.S. said defendant would "spy" on her and she described a park-like area in the apartment complex where he would sleep. When she called the police, he would hide in the complex and then return after police left. She also described living under such stress that she was unable to sleep or think straight, she was always concerned that he might be outside the apartment, and she eventually left her job due to the stress and fear defendant would show up there.

Against this backdrop, defendant made clear to L.S. through phone calls and texts that he was following her on May 1, 2017, and he threatened to harm her and himself. He then showed up at L.S.'s and A.W.'s apartment, where L.S. and A.G. saw him driving around without his headlights on. Defendant called L.S. and wanted her to come outside. L.S. feared for her life and her cousin called 911. When L.S. went to her car so she could trigger the exit gate to let the police in, defendant drove up behind her and tapped her car with his.

Defendant then drove directly at Officer Salazar before initiating a high speed pursuit with the police. Despite the fact that he was being pursued by the police, defendant called L.S. multiple times and even spoke once with Officer Glenn.

The events on May 1, 2017, caused L.S. to move out of the apartment she shared with A.G. in fear and she testified that she planned to go somewhere defendant could not find her. On May 9, 2017, L.S. had already moved out, but defendant was not aware of this and he once again drove into the gated apartment complex looking for L.S. It was the middle of the night. A.W., who had been asleep, testified that she heard defendant rattle the front door and the window of the bedroom she and L.S. shared before L.S. moved out. Defendant called out for L.S. even though A.W. told him L.S. was not there, and he threw rocks at the window until he hit it so hard with something that A.W. called the police in fear he was going to get into the apartment.

After police arrived, they found defendant hiding in the backseat of his car, which was backed into a parking stall in a position that allowed defendant to see the door, the windows and the stairwell leading up to the apartment. On the front seat of the car was a bag containing items that would enable him to commit a killing: a large butcher knife, duct tape, gloves and trash bags. During interrogation, defendant admitted that he was upset with L.S., that he had threatened to kill her on May 1, 2017, and that he brought

14

the items with him "to have a discussion with [her]."

This evidence, viewed in the context of defendant's ongoing obsessive, abusive behavior toward L.S. and his threats to kill her, overwhelmingly supports the jury's finding that on May 9, 2017, defendant acted with the intent to kill L.S. Defendant's contrary argument requires that we view the evidence in the light most favorable to him and conclude that he intended only to get L.S.'s attention on May 9, 2017, that his presence may be attributed to his pattern of lurking around the apartment complex or sleeping in its park, and that the bagged items "are also consistent with innocent household use or unrelated to [L.S.] or to attempted murders." These arguments disregard the applicable standard of review and we reject them.

### 2) *Miller* Decision

Defendant's reliance on *Miller* is of no assistance. In *Miller*, the defendant, who was white, threatened to kill the victim, who was black, for "annoying [the defendant's] wife." (*Miller*, *supra*, 2 Cal.2d at p. 529.) The threat was made at the post office in the presence of third parties, but not the victim. (*Ibid.*) The victim was employed by the Booneville town constable and when the defendant entered the constable's hop field with a rifle that afternoon, the constable was 250 to 300 yards away and the victim was 30 yards beyond the constable. (*Ibid.*) The defendant walked toward the constable and stopped 100 yards in, apparently to load his rifle. (*Ibid.*). The victim fled during this time and the defendant, without ever raising his weapon, continued walking toward the constable, who took the rifle from the defendant without any resistance. (*Ibid.*)

The jury convicted the defendant of attempted murder, but the California Supreme Court deemed the evidence of intent insufficient and reversed the conviction, stating, "In the present case, up to the moment the gun was taken from the defendant no one could say with certainty whether the defendant had come into the field to carry out his threat to kill [the victim] or merely to demand his arrest by the constable. Under the authorities, therefore, the acts of the defendant do not constitute an attempt to commit murder." (*Miller*, *supra*, 2 Cal.2d at p. 532.) The court also found the trial court committed prejudicial instructional error regarding the element of intent, but its holding rested on the insufficiency of the evidence. (*Id.* at pp. 532–533.)

Assuming *Miller* would be decided the same way today with respect to the sufficiency of the evidence, the decision is readily distinguishable. The court's determination was expressly informed by the facts that the defendant was upset not only at the victim, but with law enforcement's inaction and that the defendant walked directly up to the constable before giving up his rifle without resistance. (*Miller*, *supra*, 2 Cal.2d at p. 532.) In this case, defendant communicated his threats directly to the victim, he went to what he believed was her place of residence, and there was no ambiguity resulting from third party involvement, let alone third

party law enforcement involvement. Accordingly, the decision in *Miller* is inapt.

### b. Overt Act

Defendant also challenges the sufficiency of the evidence that he committed an overt act toward the commission of L.S.'s murder. In the trial court, the parties argued over the applicability of the decision in *People v. Morales* (1992) 5 Cal.App.4th 917 (*Morales*) in the context of defendant's motions under sections 995 and 1118.1, and the judge who denied defendant's section 995 motion was expressly persuaded by the opinion. However, defendant contends that reliance on *Morales* is misplaced because the decision was informed by the "'slight acts'" rule, which does not apply in this case given that "evidence of [his] intent to kill [L.S.] was weak, inconsistent and unsupported by the testimony."

### 1) "Slight Acts" Rule

"When a defendant's intent is "'clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.'"" (*People v. Davis* (2009) 46 Cal.4th 539, 606, quoting *People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground by *People v. Gaines* (2009) 46 Cal.4th 172, 182, fn. 2.) Here, as discussed, defendant's intent to kill L.S. is clearly shown by the evidence and, therefore, we are unpersuaded by his argument that the "'slight acts'" rule is inapplicable.

In the early morning hours of May 9, 2017, defendant drove to and entered the gated apartment complex where he believed L.S. lived. He brought with him tools capable of muffling and restraining L.S., killing her, and hiding or disposing of evidence; and he had a direct line of sight to the apartment from his car. A.W. testified that she heard defendant jiggling the front door and bedroom window, causing her to believe he was trying to get inside the apartment, and Officer Salazar testified the window was dirty and she saw fresh smudge marks consistent with fingerprints. A.W. also testified that defendant threw rocks at the window and called for L.S., unaware that she had moved out. Defendant's presence at what he believed was the victim's apartment, his repeated attempts to make contact with her and his possession of tools to commit murder speak to more than a mere preparation to commit murder, and we reject his contrary argument.

### 2) *Morales* Decision

The parties disagree whether the decision in *Morales* is analogous and given their focus on the case in the trial court and on review, we address it. The defendant in *Morales* had a history of heavy drinking (*Morales*, *supra*, 5 Cal.App.4th at p. 920) and, on the day of the crime, he told his estranged wife over the phone that he was "'going to get'" her boyfriend (*id.* at p. 921). Shortly thereafter, the

1      defendant showed up at his estranged wife's house, pointed a gun in her face and told her, "'I am going—I am going to go get your boyfriend. Then I am going to come back for you.'" (*Ibid.*) Her boyfriend called during this time, and she warned him that the defendant had a gun and was coming to his house. (*Ibid.*) After the defendant left in his vehicle, his estranged wife called the police. (*Ibid.*)

An officer responded to the area where the victim lived, spotted what was later confirmed to be the defendant's vehicle parked on the street, and warned the victim, who was standing on his front porch, to get inside his house. (*Morales*, *supra*, 5 Cal.App.4th at p. 921.) After a second officer arrived, the defendant was found hiding in an alcove on the porch "behind a garbage can in 'kind of a catcher's crouch' with his hand in front of his groin." (*Id.* at pp. 921–922.) The defendant was approximately three or four feet away from where the victim had been standing on the porch and, from his location, he was able to see anyone leaving the house. (*Id.* at p. 922.) He had a gun inside his clothing on the underside of his upper arm, positioned to slide, barrel down, toward his hand when he dropped his arm. (*Ibid.*)

Relying on *Miller*, addressed *ante*, the defendant challenged the sufficiency of the evidence supporting his conviction for attempted premeditated murder. (*Morales*, *supra*, 5 Cal.App.4th at pp. 925–926.) He claimed that, one, given his level of intoxication, "any intent to kill … was 'skewed'" and two, "the evidence was insufficient as a matter of law to justify findings that [the] defendant committed the requisite 'direct but ineffectual act' towards killing [the victim], he had engaged in more than mere preparation, or that he would have committed a murder if the police had not found him." (*Id.* at p. 925.)

The appellate court distinguished *Miller*, which, as discussed, involved the presence of a third party constable during the alleged crime, and rejected the claim. (*Morales*, *supra*, 5 Cal.App.4th at p. 926.) The court concluded that in light of the evidence that the defendant threatened to get the victim, subsequently pointed the gun at his estranged wife while threatening to get her and the victim, drove to the victim's house, and hid three or four feet from the door, there was sufficient evidence to support intent to kill, notwithstanding the defendant's intoxication. (*Ibid.*) The court further concluded that this evidence was sufficient to support the jury's finding that the defendant's action went beyond mere preparation. (*Id.* at pp. 926–927.)

Here, the People take the position that the facts of *Morales* are virtually indistinguishable from the facts in this case while defendant contends they are markedly different. We agree with the People that the facts in *Morales* are materially similar to those here, but "attempt jurisprudence calls for a pragmatic, case-specific approach .…" (*Garton*, *supra*, 4 Cal.5th at p. 511.) Thus, *Morales* does not purport to establish a bright-line rule.

### a)  Physical Distance

The crux of defendant's argument that *Morales* is inapt is his physical distance from the apartment while hiding in the car and his possession of a knife, in contrast with Morales's location three to four feet from the victim's door armed with a gun, which would have allowed Morales to kill the victim from a distance. Defendant places too much emphasis on these factors. First, although defendant was located by police hiding in his car in the parking lot, there is evidence that he spent some time lurking around the first floor grounds outside the apartment and on the second floor at the door and bedroom window of the apartment. That he was found in his car may well have been attributable to nothing more than the arrival of police. Even from his car, however, defendant was positioned to see if L.S. left the apartment, allowing him the opportunity to surprise and attack her. As such, we are not persuaded by defendant's attempt to distinguish *Morales* on the basis that police located Morales within feet of the victim's door versus in the backseat of a car parked some distance away, but with a direct sightline to the door.

We note that in *People v. Lopez*, this court recently addressed temporal proximity in the context of a substantial evidence challenge to an attempted robbery conviction. (*People v. Lopez* (2020) 46 Cal.App.5th 505, 514, review granted July 15, 2020, S261747 (*Lopez*).) Police, aware of a gang-related plan to commit home invasion robbery (*id.* at p. 510), interrupted the gang's plan by initiating a stop of a vehicle occupied by the defendant and four other men as they approached the targeted neighborhood (*id.* at p. 513). The defendant argued on appeal that he did not commit attempted robbery because he was not yet close enough to the targeted residences. (*Id.* at p. 516.)

The panel in *Lopez* rejected the argument, explaining that the vehicle was on course to reach the targeted residences within seconds to minutes and was only thwarted by virtue of police intervention. (*Lopez*, *supra*, 46 Cal.App.5th at p. 518, review granted.) The court concluded, "The particular facts and circumstances of this case 'would lead a reasonable person to "believe a crime [was] about to be consummated absent an intervening force"—and thus that "the attempt [was] underway"' when the police interceded." (*Id.* at pp. 518–519, quoting *Decker*, *supra*, 41 Cal.4th at p. 9.) We agree with the reasoning in *Lopez*, and reiterate that here, defendant was already on the premises of the targeted apartment before his plans, too, were interrupted by the arrival of police.

### b)  Weapon Type

Nor are we persuaded that the distinction between the two types of weapons is of any significance. Defendant had a large butcher knife with him, along with duct tape capable of restraining L.S. and silencing her. We do not share defendant's view that these items, gathered together and transported in the middle of the night to the residence of an ex-partner with an order of protection against him,

consist of nothing more than "innocent household" items. The jury was well entitled to infer that defendant's actions, coupled with his clear intent, went beyond mere preparation for the crime. Based on the foregoing, we find that defendant's conviction for attempted murder is supported by substantial evidence and the trial court did not err in denying his section 1118.1 motion for judgment of acquittal made at the close of the People's case-in-chief.

**B.    Premeditation Finding**

Defendant also claims that even if we conclude his attempted murder conviction is supported by substantial evidence, the evidence is insufficient to support the jury's finding that he acted willfully, deliberately and with premeditation. Relying on his emotional state and professions of tiredness during his interrogation by Officer Glenn, he contends that "[his] mental state … precluded the 'careful thought' and 'weighing of considerations for and against the proposed actions' [citation] essential for a finding of premeditation and deliberation." Again, we disagree.

As a threshold matter, the prosecutor and defense counsel examined Officer Glenn about select statements defendant made during his interrogation on May 9, 2017, but some of the statements defendant cites in his argument, including that he lost both of his parents recently, he was tired, and it was "'too much'" were not among them. To the contrary, the jury heard that defendant was upset because he believed L.S. cheated on him during their entire relationship, that he admitted threatening to kill L.S. on May 1, 2017, and that the items in the bag were his and he brought them with him that night "to have a discussion with [L.S.]."

In this case, there was ample evidence supporting each of the *Anderson* factors. (*Anderson*, *supra*, 70 Cal.2d at pp. 26–27.) Regarding motive, defendant and L.S. had been engaged to be married before breaking up and he was upset because he believed she was unfaithful during their relationship. Despite his awareness of a restraining order prohibiting him from contacting her, defendant called and texted L.S. repeatedly, sometimes in rapid succession, and he showed up at the apartment complex where she lived repeatedly, sometimes sleeping outside. L.S. testified that defendant's behavior escalated between January and May 2017, and he persisted in attempting to contact L.S. even while leading police on a high speed chase on May 1, 2017, telling her he was upset she called the police and that he did not care. The jury could reasonably infer from the evidence that defendant was obsessed with L.S., he was unwilling to accept the end of their relationship and his stalking behavior was escalating despite law enforcement involvement, evidencing a motive to kill in the face of her rejection.

With respect to planning and the nature of the attempted killing, as previously discussed, defendant drove to what he believed was still L.S.'s residence in the middle of the night with a bag of items described by Officer Glenn during trial as consistent with murder, he attempted to make contact with L.S., A.W. feared he was about to break in, and he lurked around the premises until police found

1
2
3
4
5
6
7
8

him hiding in his car, which had a direct sightline to the apartment. Moreover, defendant admitted to Glenn that he had threatened to kill L.S. and he brought the items to L.S.'s apartment that night to "have a discussion with [her]." This evidence indicates a manner of attempted killing "'so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" .…'" (*People v. Brooks* (2017) 3 Cal.5th 1, 59, quoting *Anderson, supra*, 70 Cal.2d at pp. 26–27; accord, *People v. Halvorsen, supra*, 42 Cal.4th at pp. 419–420.) Although defendant also told Glenn that he would never harm L.S., the jury was not required to accept that statement and disregard the other evidence. In sum, the jury's finding that defendant acted willfully, deliberately and with premeditation is supported by substantial evidence and we reject his contrary argument.

9     (Doc. 24-14 at 8-22).

10         **2. Analysis**

11         In support of his sufficiency claims, Petitioner submitted a copy of his briefing before the

12     state appellate court. (*Compare* Doc. No. 1 at 17-35 *with* Doc. No. 24-11 at 18-35). This

13     approach necessarily means Petitioner wholly fails to engage with the state court's analysis and

14     rejection of these claims or present any argument as to why the state court's decision was

15     contrary to, or an unreasonable application of, Supreme Court precedent or based on an

16     unreasonable determination of the facts. Respondent argues Petitioner has not shown that the

17     appellate court unreasonably applied federal law, and ample evidence supported his conviction.

18     (Doc. No. 23 at 27). Petitioner replies that because L.S. was not in the apartment, it was

19     impossible for him to "take any immediate step or direct movement towards killing her." (Doc.

20     No. 25 at 4).

21         The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from

22     conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

23     crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The federal standard

24     for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v.*

25     *Virginia*, 443 U.S. 307 (1979). Under *Jackson*, "the relevant question is whether, after viewing

26     the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

27     found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in

28     original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under

20

1   *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare

2   rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's

3   verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed

4   with the jury").

5       The *Jackson* standard "must be applied with explicit reference to the substantive elements

6   of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

7   408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law for the

8   elements of the offense and then turn to the federal question of whether any rational trier of fact

9   could have found the essential elements of the crime supported by sufficient evidence beyond a

10  reasonable doubt.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

11      Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

12  under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

13  the Supreme Court:

14          First, on direct appeal, "it is the responsibility of the jury−not the
            court−to decide what conclusions should be drawn from evidence
15          admitted at trial. A reviewing court may set aside the jury's verdict
            on the ground of insufficient evidence only if no rational trier of
16          fact could have agreed with the jury." And second, on habeas
            review, "a federal court may not overturn a state court decision
17          rejecting a sufficiency of the evidence challenge simply because the
            federal court disagrees with the state court. The federal court
18          instead may do so only if the state court decision was 'objectively
            unreasonable.' "
19

20  *Coleman*, 566 U.S. at 651.

21      Under California law, "[a]n attempt to commit a crime consists of two elements: a specific

22  intent to commit the crime, and a direct but ineffectual act done toward its commission."  Cal.

23  Pen. Code § 21a.  "The overt act element of attempt requires conduct that goes beyond mere

24  preparation and shows that defendant is putting his or her plan into action."  *People v. Garton*, 4

25  Cal. 5th 485, 510 (2018).  For example, if a person "decides to commit murder," "buys a gun and

26  plans the shooting, but does no more, he will not be guilty of attempt."  *Id.*  However, if the

27  person also "does an act sufficiently close to completing the crime, like rushing up to his intended

28  victim with the gun drawn, that act may constitute an attempt to commit murder."  *Id.*

21

1    A sentencing enhancement applies when "the crime attempted is willful, deliberate, and

2    premeditated murder." Cal. Pen. Code § 664(a). The California Supreme Court has "identified

3    three categories of evidence relevant to determining premeditation and deliberation: (1) events

4    before the murder that indicate planning; (2) a motive to kill; and (3) a manner of killing that

5    reflects a preconceived design to kill." *People v. Gonzalez*, 54 Cal. 4th 643, 663 (2012). These

6    "guidelines are descriptive, not normative. They are not all required nor are they exclusive in

7    describing the evidence that will support a finding of premeditation and deliberation." *Id.*

8    (citation modified).

9    Here, the state court, although not citing directly to *Jackson*, applied the *Jackson* standard

10    and reasonably determined there was sufficient evidence to support Petitioner's attempted murder

11    conviction and the premeditation finding. (Doc. No. 24-14 at 8-9). The state court concluded the

12    extensive testimony regarding Petitioner's previous behavior and threats to L.S. supported the

13    intent element of attempted murder and his "presence at what he believed was the victim's

14    apartment, his repeated attempts to make contact with her and his possession of tools to commit

15    murder speak to more than a mere preparation to commit murder" in support of the overt acts

16    element. (*Id.* at 12-16). While Petitioner argues he could not have completed an overt act

17    towards the killing because L.S. was not at the apartment, the state appellate court rejected this

18    argument, highlighting that Petitioner was unaware L.S. had moved out of the apartment. (*Id.* at

19    16). The evidence at trial supports that L.S. had moved out of the apartment sometime in the

20    eight days between the May 1 events and the May 9 incident, and when Petitioner came to the

21    apartment on May 9, he attempted to enter the apartment, he kept asking for L.S., and was he

22    throwing rocks at the bedroom window where L.S. used to sleep. (Doc. 24-6 at 110; Doc. 24-7 at

23    47-48, 59). Based on this evidence, it was reasonable for the jury to conclude Petitioner's

24    conduct went beyond mere preparation towards killing L.S. and was indicative of premeditation

25    and deliberation.

26    Viewing the evidence in the light most favorable to the prosecution, it was objectively

27    reasonable for the state appellate court to determine that there was substantial evidence to support

28    Petitioner's attempted murder conviction and the related premeditation finding. As such, the state

1   appellate court's rejection of Petitioner's sufficiency claims was not contrary to, or an

2   unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable

3   determination of the facts.  The undersigned recommends that grounds one and two be denied.

### B.      Ground Three and Seven-Preliminary Hearing Errors

5        Petitioner's third and seventh ground raise similar, related issues regarding his preliminary

6   hearing.  In ground three, Petitioner argues the prosecution "committed subornation of perjury

7   and knowingly used perjured testimony" at the preliminary hearing when Officer Steven Glenn

8   testified that the apartment was L.S.'s residence.  (Doc. No. 1-1 at 48-53).  In ground seven,

9   Petitioner argues the prosecution "misled the judge in her closing argument" when she led the

10   judge to believe that the apartment was L.S.'s residence and that L.S. was present on May 9,

11   2017.  (Doc. No. 1-2 at 4).  Petitioner did not raise these claims on direct appeal but rather in his

12   state habeas petition, which was summarily denied without explanation.  (*See* Doc. No. 24-14 at

13   9-11; Doc. No. 24-18).

14        Respondent argues Petitioner is not entitled to relief on either of these grounds because

15   fairminded jurists could have rejected his claims on multiple grounds.  First, Respondent argues

16   that because there is no Supreme Court case "holding that the federal constitution entitles

17   [Petitioner] to a preliminary hearing at all," he cannot be entitled to relief based on any errors in

18   such proceedings.  (Doc. No. 23 at 28-29, 33).  Next, Respondent argues "mere inconsistencies do

19   not establish that the prosecution knowingly offered false testimony" and "prosecutors cannot be

20   held accountable for discrepancies in testimony or evidence if there is nothing from which to infer

21   prosecutorial misconduct."  (*Id.* at 29-30, 33-34).  Finally, Respondent argues "the alleged

22   misstatement was not material" because "[w]hether or not the apartment was L.S.'s current

23   residence, Petitioner himself thought it was."  (*Id.* at 30, 36).

24        "The Federal Constitution does not secure to a state court defendant a right to

25   preliminary hearing."  *Ramirez v. Arizona*, 437 F.2d 119, 119 (9th Cir. 1971).  Thus, as

26   Respondent argues, Petitioner is not entitled to any relief based on alleged errors in the

27   preliminary hearing.  *See Peterson v. California*, 604 F.3d 1166, 1169 (9th Cir. 2010) ("As the

28   preliminary hearing itself is not constitutionally required, it follows that there are no

1    constitutional-required procedures governing the admissibility of hearsay at preliminary

2    hearings."); *Liu v. Pollard*, No. 20-56338, 2023 WL 5198768, at *2 (9th Cir. Aug. 14, 2023) ("As

3    the district court noted, Liu had no constitutional right to a preliminary hearing; he likewise had

4    no constitutional right to have the preliminary hearing continued.").

5         Based on the foregoing, Petitioner has failed to show "there was no reasonable basis for

6    the state court to deny relief." *Harrington*, 562 U.S. at 98. Thus, he cannot show that the state

7    court's summary denial of his claim was contrary to, or an unreasonable application of, clearly

8    established Supreme Court precedent, nor based on an unreasonable determination of the facts.

9    The undersigned recommends that grounds three and seven be denied.

10        **C.    Ground Four-*Brady* Violation**

11        In ground four, Petitioner argues the prosecution withheld Officer Tiffany Salazar's police

12   report in violation of *Brady*.[4] (Doc. No. 1-1 at 54). Respondent argues Petitioner cannot show

13   the California Supreme Court's summary denial of this claim was unreasonable because "the

14   record indicates Petitioner's counsel had obtained the report because she cross-examined the

15   officer about alleged discrepancies between it and her testimony" and "[e]ven if Petitioner were

16   correct that the report had been undisclosed, it's still a far cry from the kind of material,

17   exculpatory evidence *Brady* contemplates." (Doc. No. 23 at 31).

18        "Under Brady, prosecutors are responsible for disclosing 'evidence that is both favorable

19   to the accused and material either to guilt or to punishment.'" *Browning v. Baker*, 875 F.3d 444,

20   459 (9th Cir. 2017) (quoting *United States v. Bagley*, 473 U.S. 667, 674 (1985)). "To establish a

21   *Brady* violation, [Petitioner] must show: '(1) the evidence at issue is favorable to the accused,

22   either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by

23   the government, regardless of whether the suppression was willful or inadvertent; and (3) the

24   evidence is material to the guilt or innocence of the defendant.'" *Sanders v. Cullen*, 873 F.3d

25   778, 802 (9th Cir. 2017) (quoting *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013)).

26        Here, Petitioner cannot establish that a *Brady* violation occurred. The record refutes any

---

[4] To the extent Petitioner challenges the withholding of the report for purposes of the preliminary hearing, his claim fails for the same reasons set forth with respect to grounds three and seven.

1    argument that the prosecution failed to disclose Officer Salazar's report because Petitioner's

2    counsel filed a pretrial motion for discovery of Officer Glenn's personal file that included Officer

3    Salazar's report as an exhibit to counsel's declaration.  (*See* Doc. 24-1 at 81-156).  Counsel's

4    declaration specifically indicates that the exhibit is "a true and complete copy of the offense

5    report, as provided to me by the Kern County District Attorney."  (*Id.* at 89).  Thus, Petitioner

6    cannot show that the report was suppressed by the prosecution.

7           As the record refutes any claim that the prosecution suppressed evidence as required to

8    establish a *Brady* violation, Petitioner cannot show "there was no reasonable basis for the state

9    court to deny relief."  *Harrington*, 562 U.S. at 98.  Therefore, he cannot show that the state

10   court's summary denial of his *Brady* claim was contrary to, or an unreasonable application of,

11   clearly established Supreme Court precedent, nor an unreasonable determination of the facts.  The

12   undersigned recommends that ground four be denied.

13          **D.      Grounds Five and Six-Prosecutorial Misconduct**

14          Although not entirely clear, grounds five[5] and six both seem to raise claims of

15   prosecutorial misconduct.  Similar to his claim in ground three, in ground five Petitioner asserts

16   the prosecution submitted false statements when Officer Glenn testified at trial that the residence

17   was L.S.'s apartment.  (Doc. No. 1-1 at 61-63).  Ground six challenges the prosecution's closing

18   argument at trial, asserting it misled the judge to believe the residence was L.S.'s apartment.

19   (Doc. No. 1-1 at 64).

20          Respondent argues Petitioner is not entitled to relief on these claims because he cannot

21   show that he was prejudiced because "[t]he discrepancy regarding the apartment was so minor

22   that none of the parties noticed it[,]" and "based on the overwhelming evidence Petitioner

23   intended to kill L.S., the court could still infer that [Petitioner] thought she was living there on

24   May 9, 2017."  (Doc. No. 23 at 36).

25          Addressing the substance of ground five first, Petitioner cannot show that there was no

26

---

27   [5] Respondent argues ground five is not cognizable because it raises only conclusory allegations that do not
explain why Petitioner is entitled to relief.  (Doc. No. 23 at 33).  However, the undersigned construes
28   ground five as raising a claim of prosecutorial misconduct and finds that it fails on the merits.

1    reasonable basis for the state court to reject his claim regarding Officer Glenn's testimony.

2    "[I]mplicit in any concept of ordered liberty" is that the State may not use false evidence to obtain

3    a criminal conviction.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citation omitted).

4    Additionally, a state violates a criminal defendant's right to due process when, although not

5    soliciting false evidence, it allows false evidence to go uncorrected when it appears.  *See Alcorta*

6    *v. Texas*, 355 U.S. 28 (1957). To prevail on a *Napue* claim, "the petitioner must show that (1) the

7    testimony (or evidence) was actually false, (2) the prosecution knew or should have known that

8    the testimony was actually false, and (3) ... the false testimony was material."  *Hayes v. Brown*,

9    399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotations and citations omitted).

10   Unlike a *Brady* violation, because cases of prosecutorial misconduct involve "corruption of the

11   truth-seeking function of the trial process" a *Napue* inquiry requires only that there be "any

12   reasonable likelihood that the false testimony could have affected the judgment of the jury."

13   *Dickey v. Davis*, 69 F.4th 624, 636-37 (9th Cir. 2023) (quoting *U.S. v. Agurs*, 427 U.S. 97, 103–

14   04 (1976); *accord Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc).

15        Here, however, Petitioner cannot show that Glenn's testimony was false.  Glenn answered

16   questions concerning whether he "had been to [L.S.'s] apartment the week prior" such that he was

17   "familiar with where [L.S.'s] apartment was" when he responded to the 911 call on May 9, 2017.

18   (Doc. 24-7 at 107-108).  He also answered questions regarding where L.S.'s "apartment was" and

19   whether L.S.'s apartment could be seen from where Defendant was parked on May 9.  (*See id.* at

20   109-11).  Petitioner categorizes the references to the apartment as belonging to L.S. as false

21   because she was not living there on May 9, 2017.  However, there was testimony that L.S. lived at

22   the apartment from January 2017 until sometime between May 1, 2017 and May 9, 2017.  (Doc.

23   No. 24-6 at 110, 152; Doc. 24-7 at 45).  Because L.S. had lived in the apartment—specifically

24   when Glenn first encountered her on May 1, 2017—his statements concerning L.S.'s apartment

25   were not necessarily false because it was where L.S. lived during his encounter with her just a

26   little over a week before.

27        Turning to ground six, Petitioner cannot show there was not a reasonable basis for the

28   state court to reject his claim of prosecutorial misconduct arising from the prosecution's closing

1   arguments. "To decide if improper comments give rise to a constitutional violation, the relevant

2   question is whether the prosecutors' comments so infected the trial with unfairness as to make the

3   resulting conviction a denial of due process." *Michaels v. Davis*, 51 F.4th 904, 951 (9th Cir.

4   2022) (quotation marks omitted) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

5   Here, the prosecutor argued Petitioner "drove to [L.S's] apartment," "tried to get into [L.S.'s]

6   apartment," and tried to "lure [L.S.] out of her apartment." (Doc. 24-8 at 179). However, the

7   prosecutor also specifically addressed that L.S. had moved out prior to May 9 and was not in the

8   apartment at the time, stating: "And, ladies and gentlemen, had [L.S.] not moved out prior to that

9   day, had [L.S.] been home on that night, we would be here for a completely different posture

10  trial." (*Id.* at 180). Thus, Petitioner cannot show that any improper reference to L.S.'s apartment

11  infected the trial with unfairness because the prosecutor reminded the jury that at the relevant

12  time, L.S. was not living at the apartment.

13       Considering all the evidence presented at trial, there is no reasonable likelihood that any

14  references to the apartment belonging to the victim impacted the jury's verdict. Accordingly, the

15  state court's rejection of Petitioner's prosecutorial misconduct claims was not contrary to, or an

16  unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable

17  determination of the facts. The undersigned recommends that grounds five and six be denied.

18       **V. CERTIFICATE OF APPEALABIILTY**

19       A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

20  court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;

21  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a

22  district court to issue or deny a certificate of appealability when entering a final order adverse to a

23  petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

24  Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial

25  showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires

26  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

27  his constitutional claims or that jurists could conclude the issues presented are adequate to

28  deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **ORDERED**:

The Clerk of Court is directed to update the docket to reflect the substitution of Chance Andes as named Respondent.

Additionally, it is **RECOMMENDED**:

1. Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No. 1);

2. Petitioner's construed motion to amend (Doc. No. 44) is DENIED; and

3. Petitioner be denied a certificate of appealability.

### NOTICE TO PARTIES

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen (15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

Dated:    July 3, 2025

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE